ALBANY,
Jan. 1815.

WALDEN
v.
FIREM. INS. Co.

WALDEN AND WALDEN *against* THE NEW-YORK FIREMEN
INSURANCE COMPANY.

The insured is not bound to disclose to the insurer any circumstances relating to risks which the latter does not assume, and which are excluded by a warranty either express or implied.

So, the insured, *unsolicited*, is not bound to disclose circumstances relative to the seaworthiness of the ship, or facts showing carelessness and want of economy in the master, provided they do not tend to impeach his honesty.

To constitute barratry, there must be a fraudulent intent.

The insured must employ a captain of competent nautical skill, and of good general character; but facts or information as to his carelessness, extravagance, and want of economy, are not material to the risk of barratry, and need not be disclosed.

THIS was an action on a policy of insurance, on the ship Suffolk, Cartwright, master, from Belfast to Lisbon, and thence to New-York. The cause was tried at the New-York sittings, in April last, when a bill of exceptions was taken by the defendants to the evidence admitted by the judge, and to his charge to the jury.

The Suffolk sailed from New-Orleans in September, 1810, for Belfast, but on the way thither was compelled to put into the Havanna, in the island of Cuba, for a supply of water. While in the Havanna, the master of the ship drew a bill on the plaintiffs, for about 800 dollars, in favour of a mercantile house in that place, which bill was never accepted or paid by the plaintiffs, for these reasons: that they had had information from the captain that the vessel put into the Havanna merely for water; and, that the bill was unaccompanied with any account or information of repairs or supplies furnished the vessel there. The vessel, after a short stay in the Havanna, resumed her voyage for Belfast; but by reason of damage arising from tempestuous weather, she was compelled to put into Cork, in Ireland, where she arrived on the 18th of January, 1811; and, having undergone thorough repairs, left there on the 29th of April, and arrived in Belfast on the 3d of May.

The vessel and cargo had been placed by the plaintiffs under the general direction and control of Cropper & Co., of Liverpool, and while at Cork, Harvey & Co. acted as agents for the ship. On the 19th of March, 1811, Harvey & Co. wrote a letter to Cropper & Co., stating that "a vessel had got foul of the Suffolk, and carried away her bowsprit; that they feared that Captain Cartwright was careless of his business, and that his amount of repairs and expenses would astonish them all; that they had no control further than to recommend, as he was his own master; that his detention had been very great, yet he seemed very easy under it." A copy of this letter was transmitted by Cropper & Co., in a letter of the 23d of March, 1811, to the plaintiffs, in which they say, "This day we shall write

again [to *Cartwright*] pointedly, and urge that necessity of economy and despatch which we early enjoined him to observe. All that in us lies shall be done to get the *Suffolk* on to *Belfast*, and to guard your interest; but if a master of a ship will not do his best, an agent is placed in ungrateful circumstances. The accident to his bowsprit will cause some further (but we hope not much) delay to pursuing her voyage."

The above letters were received by the plaintiffs before insurance was effected, but they were not communicated to the insurers, nor was the circumstance of the bill drawn by *Cartwright* at the *Havanna*, on the plaintiffs, nor the letters immediately following from the plaintiffs to *Cropper & Co.*

In answer to the above-mentioned letter from *Cropper & Co.* the plaintiffs, on the 10th of *May*, 1811, write, " that they had received their letters of the 19th and 25th of *March*, which confirm their apprehensions as to Captain *Cartwright's* conduct; that if he is still under their control, they wish them to discharge him, if they can procure another master well qualified; and not to pay him any thing, but leave it to them to settle with him in *New-York*; and to transmit to them their accounts of advances to him, with necessary vouchers." In a subsequent letter of the 13th of *May*, to the same persons, the plaintiffs say, " Annexed is a copy of our last, to which refer; and we confirm our instructions then given, as to the dismissal of Captain *Cartwright* from the command of our ship *Suffolk*, if you should think it necessary to our interest."

The above letters were, at the trial, given in evidence on the part of the defendants; the plaintiffs likewise, afterwards, offered in evidence the letter of the 13th of *May*, above mentioned, and which had previously been read on the part of the defendants, which was objected to, but was admitted by the judge, and his opinion excepted to by the defendants.

The ship left *Belfast* on the 2d of *July*, with instructions to proceed to *Lisbon*, and from thence to *New-York*. She arrived at *Lisbon* on the 14th of *July*, and having taken in eighty moys of salt, for which the master gave a bill of lading to deliver the same in *New York*, she left *Lisbon* on the 19th of *August*, after being cleared out for *New-York*, with verbal directions from the consignees at *Lisbon* to proceed to *New-York*. Two weeks before the ship left *Lisbon*, the master expressed to his mate an

intention of going to *New-Orleans*; but on being questioned by one of the consignees at *Lisbon*, who had heard a report of his having given such an intimation, he denied it, and declared his intention to be to proceed to *New-York*.

The vessel, notwithstanding, proceeded to *New-Orleans*, and, as was stated in the deposition of the mate, the master, instead of pursuing what he, the deponent, understood to be the usual course from *Lisbon* to *New-Orleans*, for vessels drawing no more water than the *Suffolk*, steered for *Antigua*, and passed just to the north of it; thence between *St. Bartholomews* and *Barbuda*; thence to the northward of the *Virgin Islands*, *Porto Rico*, and *Hispaniola*, and thence through the *Old Straits*. While passing through the *Straits*, the ship came to an anchor, and her cables were parted; whereupon, by the direction of the captain, the cables were cut close to the vessel, for which the mate, as he stated in his deposition, believed there was no necessity. After this, the ship proceeded for *Matanzas*, in the island of *Cuba*, where she arrived on the 7th of *October*, and the captain went to the *Havanna* to obtain a new cable and anchor, which were brought on board the ship about the 18th of *October*; she was, notwithstanding, unnecessarily detained by the master until the 29th of *November*.

While at *Matanzas*, the captain hypothecated the ship to one *Francis Drake*, for 1,563 dollars; but how the debts which were thus secured had arisen, or how the money raised by the bottomry had been appropriated, did not appear. He likewise gave a bill of lading, on account of some advances made to him, of the salt on board his ship, to one *Madan*, a merchant at *Matanzas*, to be delivered to one *Morgan*, at *New-Orleans*.

The vessel arrived at *New-Orleans* in *December*, 1811. The agent for the plaintiffs at *New-Orleans*, by the direction of the plaintiffs, demanded of the captain to deliver up the ship to them, which, on his refusing to do, he proceeded, in the district court, to dispossess the master, and, during the pendency of such proceedings, the ship was libelled in the parish court of *New-Orleans*, on the bottomry bond to *Drake*, and was, by the order of the court, sold for the benefit of all parties. The salt on board of the *Suffolk* was claimed by *Morgan*, by virtue of the before-mentioned bill of lading to *Madan*; and on the plaintiff's agent opposing the delivery of it to him, an attachment was, at the instance of *Morgan*, issued out of the parish court

of *New-Orleans* against the salt, and also the ship; and, by order of the court, the salt was appraised, and bonded by the plaintiffs' agent.

The judge charged the jury, that the evidence of barratry was conclusive, and that the insured were not bound to communicate to the insurers, at the time of making insurance, any of the letters above mentioned which were in their possession, nor any of the circumstances within their knowledge respecting the master of the ship. The jury found a verdict for the plaintiffs, and the defendants excepted to the opinion of the judge; and the bill of exceptions, according to the directions of the statute, was returned to this court; on which a motion was made to set aside the verdict, and for a new trial.

*S. Jones*, jun. for the defendants. The conduct of the master did not amount to barratry; but we shall not discuss that question.

The principal objection is, that there was a material concealment on the part of the plaintiffs. The letters and other matters relative to the conduct and character of the master, in their knowledge, at the time the insurance was effected, ought to have been disclosed to the defendants.

It is a general and well-settled rule, that every fact and circumstance which could influence the mind of a prudent and intelligent insurer, in determining whether he will underwrite the policy, or not, is material, and ought to be communicated to him.* So, a suppression of circumstances, a knowledge of which might have induced the insurer to demand a higher premium, will vitiate the policy.† Even doubtful rumours respecting the safety of a ship have been held material, and the concealment of them will avoid the policy.‡

The safety and success of the voyage insured materially depend on the character and conduct of the master. It is of the greatest importance to the insurer to know whether the master be prudent, vigilant, and discreet; or improvident, careless, and extravagant, in the management of the business and property entrusted to his charge. The *barratry* of the master is one of the perils insured against, and the insurer is, therefore, interested in being informed of those habits of extravagance and carelessness, which naturally lead persons, in that situation, to the commission of barratry. That the master had a fair cha-

*Marsh. on Ins. 464, 465.
3 Burr. 1909.
1 Bl. Rep. 594.
† 3 Dallas, 491.
1 Johns. Rep. 522. 4 Bos. & Pull. (1 N. S. 151., Littledale v. Dixon.
1 Esp. Rep. 373.
‡ 2 P Wms. 170. 2 Str. 1183. Marsh. 471— 476. Park, 249, 250. 300.

racter when he sailed from *New-York*, is an additional reason for requiring from the insured a communication of the facts relative to his subsequent bad conduct, as the defendants, relying on that previous fair character, would be more easily induced to take upon themselves the risks of the policy. It is the moral conduct of the master, in relation to his trust, in which the insurers are interested, for it is against his fraudulent conduct that they have insured. Whatever may be his character or conduct, in this respect, his nautical skill may be the same. The bad character of the master, therefore, cannot be said to come within any implied warranty as to seaworthiness.

*Griffin* and *T. A. Emmet*, contra. In case of a warranty, express or implied, no communication is required on the part of the insured. Seaworthiness is an implied warranty. It is a a part of this implied condition that the ship should have every thing necessary to her safe navigation, such as a sufficient crew, and a captain of competent nautical skill.* The nautical skill of the master, is at the risk of the insured. It is a matter for which they undertake. So far as any other quality entering into his general character goes to his fitness for the employment, it also enters into his nautical character and competency. It is, therefore, a part of the implied warranty of the assured, that the master shall have ordinary integrity, or a good general character, at the place from whence the vessel sails, or when the risk commences.

The extravagance of the master in repairs, is nothing; for if he expends more than he ought, the owners, not the insurers, must pay the excess. A bad captain for the owners, may be a very good one for the insurers.

Again, the letters, the concealment of which is complained of, contained only hints and suspicions; and the real objection is, that the insured did not communicate these suspicions and apprehensions, which might have injured, very unjustly, the character of the master. It is facts, not suspicions, which the insured is bound to disclose. It is not every thing which increases the risk, the concealment of which will vacate the policy.† In the case of *Haywood v. Rodgers*,‡ which was an insurance at and from *Trinidad*, the insured had received a letter from the captain, informing him, that he had been obliged

* 7 *Term Rep.* 100.

† *Toulmin v. Inglis*, 1 *Comp. Cases*, 421.
‡ 4 *East's Rep.* 590, 596.

to have a *survey* on the ship, at *Trinidad*, on account of *her bad character*, but the survey which accompanied the letter gave the ship a good character, it was held, that the non-disclosure of the letter and survey to the insurers, did not vacate the policy; though, if they had been communicated, it would have enhanced the premium. To constitute such a concealment as will vitiate the policy, it must be of something palpably material to the risk, and about which there can be no doubt.

Again, the insured could not certainly know, at the time the policy was underwritten, who was the captain, for they had previously written to their correspondents, *Cropper & Co.*, authorizing them, in their discretion, to discharge *Cartwright*, and appoint another captain.

*Wells*, in reply. The assured had received such information of the conduct of Captain *Cartwright*, as had destroyed all their confidence in his integrity. It was not a matter of mere suspicion or rumour. It was believed by them to be true, and they acted on that belief, as to the fact of his misconduct. In *Sperry* v. *The Delaware Insurance Company*,[*] *Washington*, J. held, that even if the materiality of the communication was doubtful, it ought not to be withheld, for it is the duty of the insured to give the other contracting party an opportunity of judging, equally with himself.

The moral character of the captain is not included in the implied warranty of *seaworthiness*, which extends only to the nautical skill of the captain and crew. Yet this moral character may be very essential to be known by the insurers, in regard to the risk of *barratry* assumed by them. If, under the implied warranty of *seaworthiness*, the insured were to be considered as warranting the moral character of the master, that warranty would extend also to the *crew*, which will hardly be pretended. Such a doctrine would put an end to the business of insurance. All that we contend for is, that the insured shall not employ a master or agent whom *they know* to be destitute of integrity, or incompetent. As regards the implied warranty of seaworthiness, the knowledge or ignorance of the insured as to the fact, makes no difference.

It is said to be a part of the implied warranty, that the master had a good general character at the place of departure Now the fact is, that the master, in this case, had lost all cha-

ALBANY,
Jan. 1815.

WALDEN
v.
FIREM. INS. Co.

* *Marsh. Ins.* (*Condy's* ed.) 473 (*a*) note (75).

racter before he arrived at *Belfast.* If so, then, on the doctrine of the plaintiffs, there has been a breach of the warranty, which puts an end to the contract. But how is the warranty, as to the moral character of the master, to be reconciled with the undertaking of the assured to indemnify against the barratry or fraudulent conduct of the master?

The whole doctrine, as to concealment, rests on this principle, that it is not the duty of the insurer to inquire, but that of the insured to disclose.

PLATT, J. delivered the opinion of the court. This case is presented in the form of a bill of exceptions, and the counsel for the defendants move to set aside the verdict on the following grounds: viz.

1. That improper evidence was admitted.
2. That the judge misdirected the jury.
3. That the verdict is against law and evidence.

The question of undue concealment in this case presents two aspects:

First, in regard to *seaworthiness*, which implies a warranty on the part of the assured that the ship shall be in a fit condition for the voyage, with all her equipments; and, also, that she shall have a competent master and crew.

Secondly, the express warranty in the policy, against *barratry.*

With respect to the first, it is not necessary that there should be any representation; because the seaworthiness of the ship is an implied condition of the contract of insurance.

The rule is, that there should be a representation of every fact within the knowledge of the assured which is material to the risk incurred by the underwriter; except it be covered by a warranty on the part of the assured. (*Shoolbred* v. *Nutt, Park,* 300.) Both parties, therefore, as to the facts which constitute seaworthiness, have a right to remain silent at the time of making the contract; and then, if, in fact, the ship be not in all respects seaworthy at the time when the risk was to commence, the policy is void.

Unseaworthiness, under this policy, (which is in the common form,) is at the risk of the assured; and, therefore, they are not bound to disclose any thing, unsolicited, on that subject.

If we suppose a policy wherein the underwriter expressly warrants the ship to be seaworthy, then, indeed, the duty of making disclosures would apply with full force against the assured. If the underwriter, however, (upon the ordinary policy,) chooses to make inquiries, the assured is bound to answer truly. (*Haywood* v. *Rodgers*, 4 *East*, 590.)

The practice of omitting to make inquiries as to seaworthiness, arises, I presume, from this prudent consideration, that every material disclosure on that subject would lessen the obligation of the implied warranty on the part of the assured; and the underwriter, wishing to leave that obligation unimpaired and unqualified, generally chooses to receive no communications as to the condition of the ship or the character of the master. For so far as the representation extends, according to the truth of facts, the implied warranty of seaworthiness ceases on the part of the assured.

The case of *Shoolbred* v. *Nutt*, (*Park*, 300. 1 *Marsh*. 475.) was an insurance upon a ship from *Madeira* to *Charleston*. The ship had sailed from *London* to *Madeira*. The plaintiff procured insurance, without communicating to the underwriters two letters which he had received from his captain the day before he effected the insurance, stating "that the ship had arrived at *Madeira*, but was very leaky; and that the pipes of wine on board of her had been half covered with water." But it was proved at the trial, that the leak had been completely stopped before she sailed from *Madeira*. Lord *Mansfield* decided, that it was enough that the ship actually sailed in good condition when the risk commenced, and that the assured were not bound to disclose the information contained in the letters.

The case of *Haywood* v. *Rodgers*, (4 *East*, 590. 1 *Marsh*. 476.) was an insurance upon a ship from *Trinidad* to *London*. The assured had received a letter from his captain, informing him, "that he had been obliged to have a survey on the ship at *Trinidad*, on account of her bad character." But the survey which accompanied the letter gave the ship a good character; and it was held, that the non-disclosure of the letter and survey to the underwriters, did not vacate the policy, although it appeared in evidence, that such circumstance, if known, would have enhanced the premium.

In all the numerous cases cited by the counsel for the defendants, to exemplify the rule that the assured is bound to disclose

ALBANY,
Jan. 1815.

WALDEN
v.
FIREM. INS. CO.

every material fact within his knowledge, the risks to which the concealments related, were directly assumed by the underwriters.

If the letters charged to have been concealed in this case related merely to the risk of unseaworthiness, it is a sufficient answer, that the assured never sought indemnity against that risk; on the contrary, it was an essential part of this contract, that the assured should warrant every ingredient of seaworthiness.

The rule applicable to this subject is expressed with great precision and accuracy by *Washington*, J. in the case of *Kohne* v. *Insurance Company of North America*, (1 *Marsh.* 473. note 75. by *Condy*,) viz. " The underwriter takes upon himself the risk *which the assured is not willing to bear*, always under the implied condition, that he shall, as to all facts within the private knowledge of the assured, be equally informed as himself."

In this view of the case, therefore, it appears to me, that the judge very properly charged the jury that the assured were not bound to disclose the letters and other facts in regard to the character and conduct of the captain.

I am also satisfied, that upon the question of seaworthiness, embracing the character of the captain, the verdict is not against the weight of evidence.

In examining this case, in the second point of view proposed; that is, as an *insurance against barratry*, it presents a contract of a complicated and extraordinary kind, " making the underwriter (as Lord *Mansfield* expresses it) become insurer of the conduct of the captain whom he does not appoint, and cannot dismiss, to the owners who can do either." It is here worthy of remark, that the qualities and condition of the ship and her apparel may be certainly known by survey and inspection, but the heart of man, and his moral structure, are in a great measure unsearchable by human discernment. To seek indemnification, therefore, against human frailties, by insurance against barratry, is a legitimate object, and favorable to commerce.

I consider the contract to be essentially this : that the assured shall, in good faith, employ a captain of competent nautical skill and general good character; and if he do so, then, and not otherwise, the insurer is liable for barratry.

Here it is important to ascertain, with precision, the true de-
finition of " barratry."

According to *Valin, Pothier, Emerigon,* and *Le Guidon,*
" Barratry comprehends every fault of the master by which a
loss is occasioned, whether arising from fraud, negligence, un-
skilfulness, or mere imprudence." But in the *English* law, it
has a more limited signification. No fault of the master amounts
to barratry, unless it proceed from a fraudulent purpose;
(2 *Marsh.* 518.) or, in the language of Ch. J. *Lee,* (cited and
recognised as law in *Phin* v. *Royal Exchange Assurance Com-
pany,* 7 *Term Rep.* 508.) " Barratry must be some breach of
trust in the master, *ex maleficio ;*" or, as defined by Lord *El-
lenborough,* (*Earl* v. *Rowcroft,* 8 *East,* 126. *Park,* 121.)
" there must be fraud, or crime, to constitute barratry."

According, then, to the established meaning of the term
*barratry,* in the *English* law, the underwriters, in this case,
insured against the acts of the captain which might be *fraudulent*
or *criminal,* and his *breaches of trust, ex maleficio.* Now, the
question properly occurs, did the assured conceal from the un-
derwriters any information material to that risk?

The facts here charged to have been unduly concealed,
are,

First, that the captain, on his outward voyage, several months
before this policy was signed, touched at the *Havanna* for
water, and there drew a bill on his owners, the assured, for
about 800 dollars, which they refused to pay; alleging, as a
reason for such refusal, that the bill was not accompanied by a
letter of advice from the captain.

Secondly, the written correspondence between *Harvey,
Deaves & Harvey,* of *Cork, Cropper, Benson & Co.* of *Liver-
pool,* and the assured, of *New-York.*

The inference attempted to be drawn from the transaction of
the protested bill, seems to me so remote and equivocal as to
deserve little consideration.

The letters of *Harvey, Deaves & Harvey,* and *Cropper, Ben-
son & Co.,* strongly imply a charge against Captain *Cartwright*
of negligence and want of economy in the repairs of the ship,
then at *Cork.* They say, " we fear he is careless of his business,
and that his amount of repairs and expenses will astonish us all."
" His detention has been very great, yet he seems very easy

under it." But there is no charge nor surmise in these letters, which goes to impeach the *honesty* of the captain. They do not even intimate that he was addicted to any practices that would naturally lead him to commit a breach of trust, *ex maleficio;* and although the assured, by their letters of the 10th and 13th *May,* 1811, seem to have yielded to the suggestions against the captain, and directed their agents to discharge him, and to employ another in his stead, if their agents should think it necessary for their interest; yet it is fair to conclude, that the assured were thus actuated, merely from the considerations stated in the letters of *Harvey, Deaves &c Harvey,* and *Cropper, Benson & Co.*

For aught that appears, therefore, the only ground of dissatisfaction in the minds of the assured or their agents, was the *careless delay* and *want of economy* in the captain, which are characteristic of seamen, and which are so frequently united with strict honour and fidelity in that class of men.

My conclusion, therefore, is, that, although the contents of those letters might seriously affect the interest of the owners, who were solely responsible for the port-charges referred to in those letters, yet they did not relate to the risk of barratry assumed by the underwriters in this policy; and that the opinion of the judge at the trial was correct, in stating that the assured were not bound to communicate them.

The letters of the 10th and 13th of *May,* 1811, were written by the assured in *New-York,* to their agents, *Cropper, Benson & Co.* of *Liverpool.* The policy was signed at *New-York* on the 12th of *August,* 1811, the ship *Suffolk* being then at *Belfast;* and although, Captain *Cartwright* was named as master in the policy, that could only have been intended to identify the ship. The question here is the same as if the policy had been *blank* as to the master.

The absolute right of the owners to change the master at any time, without the knowledge or consent of the underwriters, is unquestionable. The instructions which the assured had given to their agents in *Liverpool,* in regard to the master, were prudent and discreet.

Considering that the ship was in a foreign port; that the assured were under a general and unqualified obligation to provide a suitable master, and that neither the law nor usage required that they should consult with the underwriters as to

the selection of a master, it was sufficient, in this case, if the assured and their agents acted discreetly, and *bona fide*, in retaining Captain *Cartwright*.

It would be unreasonably severe, and would defeat almost every policy of insurance against barratry, if the assured were held strictly bound to disclose every immoral act imputable to the master, and every unfavourable report respecting him, which had reached the ear of the assured previous to signing the policy. Such a rigorous application of the rule in the varied fortunes and vicissitudes of a seaman's life, would be impolitic and unjust.

There must be some limits to this duty of making disclosures in such cases. It cannot be necessary that the assured should give to the underwriter a minute history of every thing which they have known or heard of, touching the moral character of the intended master.

If his general character be good, and the assured have no knowledge or information of any fact *impeaching the honesty* of the master; the charge of undue concealment has no legal foundation.

In this case the unfavourable opinions expressed in the letters of *Harvey, Deaves & Harvey*, and of *Cropper, Benson & Co.*, respecting Captain *Cartwright*, were repelled by the evidence of his good character as a sailing master in *New-York*, where he had been long known.

I cannot entertain a doubt of the propriety of allowing the plaintiffs to give in evidence their letter of the 13th of *May*, 1811, because it formed part of the contents of a paper, an *extract* of which had been read in evidence by the defendants. It was, altogether, one entire communication, though composed of an original letter, and a copy of another letter; and neither party had a right to read part, without the whole.

It was fully proved, (and admitted on the argument,) that the captain did commit barratry.

Upon the whole case, therefore, I am of opinion, that the plaintiffs are entitled to judgment.

Judgment for the plaintiffs.